Where did all these people come from? They weren't here for the last one. Step up and identify yourself. Hello. I pretty much know both sides here. Two of my favorite attorneys. I hate to see them going against each other, actually, but what can we do? Good morning, Your Honors. Good afternoon, I should say. Yeah, it shouldn't have been, but the one guy, he just, he wouldn't quit. Karen DeGrant for the defendant, Appellant Clare Oaks. Matt Henderson, also on behalf of the defendant, Appellant Clare Oaks. I'm handling the attorney fee and cost issue. We previously submitted a motion to divide our time. Right. No problem. Since we kind of broke all the rules on the first one, I suppose you guys may. One thing, introduce yourself. Good morning, I'm Michael Vasak. I'm here on behalf of the plaintiff, Appellees, Susan Grauer and Tom Kremlin, the executives. I would not spend much time on wrongful death. I think we pretty much have closed the door on that in our minds. With that case, which the same attorneys argued, it's the same trial attorneys, right? Yeah, so you kind of know what we're thinking on that. So I just, that'll help you with your time. All right, proceed. And if it's okay with Your Honors, I was going to lead off with our arguments on the attorneys fees and costs. Sure. May it please the Court. Here we believe the trial court erred by awarding attorneys fees under the Nursing Home Care Act, based solely on the lawyer's contingency fee agreement with the client. Case law in Illinois is clear that the fundamental task of the trial court in awarding attorneys fees under a fee-shifting statute is to determine that the fees are, in fact, reasonable. The starting point to determine reasonable attorneys fees is a properly supported fee petition under the Lodestar method. That fee petition is required to include the legal services that were performed, by whom, the time expended, and the hourly rate that was charged. Here, the trial court only relied on the contingency fee agreement. Again, Illinois law is well settled that the contingency fee agreement is a factor that can be considered by the trial court, but here it was the only factor considered by Judge Lyons. I thought the Burlock case pretty much settled it down. That was his primary choice, and it's in his discretion to do that. But once you've got a contingency fee agreement, you don't have to go to the other. I respectfully don't believe the Burlock case stands for that proposition, Judge. In Burlock, the defendants tried to hold plaintiffs to the terms of the contingency fee agreement to prevent them from recovering fees in addition to that. In Burlock, the plaintiffs did submit a fee petition on top of the contingency fee agreement, and the court, in fact, did affirm an award of attorney's fees, which was in excess of the contingency fee agreement. So it's our position that Burlock supports us in that regard. By contrast here, Judge Lyons ruled that he did not have to address the adequacy of the bill keeping, the hourly rate, or the absence of contemporary time records. What exactly was considered? There was an evidentiary hearing. There was an evidentiary hearing. What exactly was considered at the hearing? We put on Mr. Levin and cross-examined him. We put on our expert witness, and then we did closing arguments. The judge's ruling, however, stated that he relied exclusively on the contingency fee agreement. Judge Lyons ruled that because there was a contingency fee agreement and he was satisfied that that was a reasonable amount of attorney's fees, he did not have to go into the Lodestar method or plaintiffs' reconstructed time records. And in terms of those reconstructed time records, the plaintiffs in their reply brief in support of their fee petition for the first time came up with some reconstructed time records, which we believe were completely unreliable. One attorney, for instance, lumped an entire year of time for correspondence and emails into one single time entry. Attorneys for plaintiffs billed between 14 and 22 hours in a single day preparing for depositions. There was an associate who billed exactly 20 hours in increments of 0.5, and there was an associate who even billed 25 hours in a single day. And we feel that we should have been entitled to some limited discovery. We'd served interrogatories and requests to produce for the backup materials from the reconstructed time records, again, which came to us for the first time in the reply brief. It's our position that Levin and Percanti should be charged with keeping contemporary time records because, in fact, this is the majority of the work that they do is under the Nursing Home Care Act. And the testimony from Mr. Levin is their office has a time entry program. They just failed to use it under these circumstances or, in fact, in any of their cases. So we've cited case law, the Keller case and the Collins case, that it is a reversible error for a court to base, a trial court to base its award of attorney's fees under a fee-shifting statute solely on a contingency agreement. I mentioned earlier that we had sought discovery, limited discovery in connection with the fee petition. Again, these reconstructed time records were filed for the first time in plaintiff's reply brief. We sought limited discovery to determine the factual bases of those recreated time records. And we believe that Judge Lyons wrongfully denied that and then wrongfully truncated our hearing. Judge Lyons had said at the outset of that morning that the hearing was going to last, that the hearing on the post-trial motion and the hearing, evidentiary hearing on the attorney's fees and costs that would be awarded would last no longer than the morning. So we were given a very brief amount of time. Out of respect for the trial court, we obviously tried to comply with that, but we believe that that was improper. And we believe that we should have been granted limited discovery to determine bases of the recreated time records in order to meaningfully cross-examine the witnesses and to determine how much time, in fact, was spent on pursuing claims that were unsuccessful against non-Nursing Home Act defendants. How do you get around the fact that the Claro trial attorney stipulated not only to the competency, but that the contingency fee was the normal procedure? Correct. Correct. So at the beginning of the hearing, we were asked to stipulate Levin and Perconte are fine lawyers, and we never contended otherwise. We also stipulated that a contingency fee award is typical in Nursing Home Care Act cases. But that was only half the inquiry. The other half of the inquiry was they were required under the Lodestar approach to submit contemporaneous time records, and we were entitled to an evidentiary hearing on those. So we were in no way stipulating that the one-third representative reasonable fee was up to the court to conduct a hearing and determine what fees would be reasonable under the circumstances based on the tasks that were performed and claims against Nursing Home Act defendants. I do want to skip ahead to the – I'll skip over the Wrongful Death Act case law, and I'd like to move on to costs. Here, the trial judge awarded $150,000 in costs against Claire Oakes. It's our position that that is a radical departure from binding Supreme Court authority. That is the Gallowich case and the more recent Vincenzo case. Under Illinois law, plaintiffs were entitled to recover their costs under Section 5-108 of the Code of Civil Procedure. The Supreme Court has interpreted that to mean court costs, filing fees, subpoena fees, statutory witness fees. Case law is clear in the Vincenzo and Gallowich cases that plaintiffs are not entitled to recover litigation costs, including expert witness fees and court reporter fees. Those were what was at issue in the Vincenzo case. What about the terms in the Vincenzo where it says, the plain and ordinary meaning of the terms cost does not enlighten us? And then it goes on to say, but if the authority comes from another statute or Supreme Court, the door is open. Well, here the two statutes use exactly the same term, Your Honor. Section 5-108 is entitled plaintiff to recover costs. The Nursing Home Care Act says that the licensee shall pay the actual damages and costs and attorney's fees to a facility resident whose rights as specified in Part 1 of Article 2 of this Act are violated. So they use the same term, costs. We'd identified a number of cases in our brief where there were fee-shifting statutes that only used the term costs. And under those circumstances, the courts had interpreted that to mean the costs that were recoverable under 5-108 or 5-109 if it was a defendant. And here the costs, we also cited to other statutes, other fee-shifting statutes, where there was a broader definition of costs. Some of the cases we cited to said costs, expenditures, and disbursements. And under those circumstances, the plaintiff would be entitled to much broader costs. So here, if costs mean anything, it means what the Code of Civil Procedure says it means. There's no need to be redundant. It's possible it's redundant, Your Honor, but it would be redundant in dozens of fee-shifting statutes, which likewise provide for the recovery of costs. And courts have interpreted those fee-shifting statutes to only allow the costs that are under Section 1-08 of the Code of Civil Procedure. When they took out the treble damages, they did not take out costs. Or the attorney's fees. That is correct, Your Honor. The plaintiffs have cited to no authority, no Illinois authority on the Nursing Home Care Act, to support their contention that the term costs somehow means something more than what's allowable under the Code of Civil Procedure. Here, Judge Lyons respectfully awarded a wide array of impermissible costs, nearly $100,000 in expert witness fees, trial exhibits, medical records, depositions, videographer, court reporter fees. Under Vincenzo, expert witness fees and court reporting fees are not to be recovered as costs to a prevailing party. Judge Lyons even went so far as to award a $48,559 expert witness fee that plaintiffs incurred in an unsuccessful attempt to prove a medical malpractice case against Dr. Begal, who is a non-Nursing Home Care Act defendant. It's our position that the only recoverable costs are those that the plaintiff is entitled to under Section 5-108, and that would be the $1,500 in court costs. Would you agree, counsel, that expert witness testimony would be critical to a plaintiff in order to prevail in this type of procedure? I believe so. I believe that's the case, Your Honor. Well, then would you also then agree that the cost of an expert witness for such a proceeding as this might be prohibitive if a plaintiff had to incur or bear the burden of that cost? I understand exactly what you're saying, but that is not what the statute allows for. The statute just refers to costs. And, again, if cost means anything, it means the same thing as in 5-108. And the Supreme Court, for whatever reason, has been very parsimonious in terms of the costs that can be recovered. There are provisions for the prevailing plaintiff to get attorney's fees, but just the term costs in the Nursing Home Care Act doesn't open the door to the wide array of damages that are awarded by Judge Lyons. And I think I'm out of time. If there are no further questions, I'd like to yield the rest of my time to Ms. DeGrand. But at the conclusion of this, we'd request that the Court vacate the award of attorney's fees and costs, remand the case for us to do some limited discovery and have a full evidentiary hearing. Thank you. Good afternoon, Your Honors. Karen DeGrand on behalf of Claire Oates. May it please the Court, Counsel. That request, of course, is only in the alternative to the judgment being vacated. And that is what we're asking for, that and a new trial. And I'll start by asking the question that I would ask, which is what sets this case apart from the typical appeal, a challenge to a jury verdict and a denial of a post-trial motion. And our position on that is the net effect of evidentiary error and improper argument diverted the jury's attention from the relevant facts on liability and denied Claire Oates a fair trial. Substantial error, cumulative and otherwise, may have tipped the scales for the plaintiff. So the rulings on the motion eliminate permitted the plaintiffs to employ a strategy that began with the opening statements, through the presentation and questioning of witnesses, and through the closing that told the jury Claire Oates is a bad place. You know, from the outset of the closing argument, where there was a reference to a built-in problem with the system that caused it to be indifferent. Indifferent to, quote, its patients, not this patient, its patients' most pressing needs at any given time on any given day. And so what was being told with that statement and then continuing throughout the trial was Claire Oates doesn't care about its patients, not this patient. There are no rules was another theme and argument. The staff is indifferent to patients, not talking again about this patient. And this was an inflammatory, emotional, righteously indignant, and frankly, effective strategy. This strategy continued through the testimony of plaintiff's experts and through the examinations of Claire Oates' former employees. That was argumentative, repetitive, accusatory, persisting with improper impeachment, references to accidents and major injuries that had nothing to do with this case. And this theme was hammered in the closing argument. Again, asking the jury not to consider the care of this patient, but defendant's entire operation. But there was evidence that there were rules in place for administration of drugs and specifically Coumadin, and those rules were not followed in this case. There was testimony that there were problems with the recording of orders in terms of where exactly it was going to be recorded into the chart, Your Honor. And so again, however, despite that, the focus should have been limited to the nursing staff who cared for this patient and not all staff as to all patients. And that's the problem that I'm trying to communicate to the court. And this was far beyond argument of counsel. And I would say that the plaintiff's nursing expert, Nurse Pignatello, led the charge with her personal outrage, and there was extensive evidentiary during her testimony. And I think any fair reading of the record of her testimony was that her inflammatory language and testimony told the jury, and this was the theme, she knew what the doctor should have done. So the message to the jury was, I'm a nurse, I knew what the doctor should have done, and therefore Claire Oak's nurses should have known too. And then, you know, as far as the inflammatory language, even when the judge tried to rein her in, she would not stop when she comments that Nurse Martinez was just plain dangerous, that the care was mind-boggling, that Nurse Pignatello was astonished, that the nursing director kept policies in a drawer somewhere. And this was also echoed by testimony from the geriatric expert, Dr. Lacks. But I think it's very significant that Nurse Pignatello voiced testimony that should only have come from a physician. And some of the objections were sustained. But again, it was so pervasive that the normal curative effect that you would associate with objections being sustained could not possibly have occurred in this instance. Here's where we want the INR. You can cause harm to a patient if dosage is incorrect. And this was a fairly extensive theme. Here's what Nurse Pignatello expected a physician to order. So I think one of the arguments that was made in response to Clare Oak's brief was that her testimony couldn't be harmful because it was cumulative of physicians who were espousing those opinions. But I think, frankly, that argument misses the point. Because again, the fact that this testimony criticizing Dr. Begal came from a nurse, this is what's telling the jury, this is, I know, I'm a nurse, I know what the doctor should have done, and therefore the Clare Oak's nurses should have overruled the physician who was not making an order that he should have made. And of course there's more, and I'm not going to go through every point that we've raised in our brief, but I do think it's important that the court note that the trial court's rulings allowed Nurse Pignatello to tell the jury that Clare Oak's nursing expert who was ill and was not able to attend the trial agreed with Nurse Pignatello. This came to the jury and, you know, may have had a huge impact. And what was the basis? Why didn't they request a limiting instruction on that? They could have. They could have requested a limiting instruction, but I think it was clear from the transcript of the pretrial hearings that this was not the kind of testimony that should have come in. And that unlike situations where an expert relies on the consultation or the opinions of another physician, or in this case another nurse, I think from the Kim case, I would argue that this court should be skeptical of the assertion at this juncture that Nurse Pignatello relied on Nurse McFadden's statement. She certainly did not rely on Nurse McFadden's deposition testimony in formulating her opinions. Her opinions were disclosed before Nurse McFadden's discovery deposition. So this really was simply here's someone else who agrees with me and this person was a consultant of Clare Oak's. And I think it's clear from the argument that plaintiff's counsel made in the pretrial fight over this issue in urging the court to permit the testimony wasn't that her expert relied on it. It was that we should be able to use this very favorable testimony. So I think reliance is not borne out by the record. So just to sort of recap Nurse Pignatello, she condemns the entire operation without foundation. There's no review of other patients' charts or other aspects of Clare Oak's operation. She used extremely incendiary language to express her views. And she gave medical opinions only within the purview of physicians. This is substantial. This is pervasive. But this nursing expert also presented herself as an expert on the law pertaining to nursing homes. And there was a challenge in the response brief that this was not the case. She was only reading portions of the law, but that's not borne out by the record. There was a testimony by her about the extent to which OBRA applied to the idea of negligence under the Nursing Home Care Act. And therefore there was more than just a reading of the law. So I think, you know, to close on Nurse Pignatello, the justification that plaintiffs rely extensively on in their brief that there were very few objections and so that the statements that she made that were objectionable were few and far between is simply is not borne out by the record. The concept of expectations. I call this a bait and switch approach to justify portions of Nurse Pignatello's testimony and Dr. Lacks, the geriatrics expert. And frankly, I don't think this is fair the way this played out to Clare Oaks. And frankly, not fair to the trial court. The plaintiffs persuaded the court during extensive hearing and motions of limine that a witness's expectations of what another healthcare professional would do or should do is not standard of care testimony. So our position was in arguing these motions, yes, it is, it's the same thing as standard of care testimony. I mean, that's exactly what it is, frankly. And then in the motion, took a change from the position that they'd taken in the motions and limine hearing, and then in the responsible trial motion said, oh, no, yeah, that's standard of care testimony. But now on appeal, again, we're getting the, oh, that's not standard of care testimony. So to the extent that there was an objection when trial counsel said expectations, which Judge Lyons knew exactly what trial counsel was talking about, now plaintiffs are arguing, well, that wasn't an objection to standard of care testimony. And I would say, yes, it was. I'm watching my time a little bit, Your Honors, but I'm sure you'll give me a nudge if I'm going over. As to the letter from the cardiologist, Dr. Popp, and I, you know, this is a discretionary ruling. I'm certainly cognizant of that by Judge Lyons, but I would say if in any case that wide latitude, and that's in every medical mental practice case, wide latitude is to be given to the cross-examination of expert witnesses, this is certainly one. The court restricted Clare Oaks from using that letter based on, frankly, based on misconceptions of the law, a very narrow view of the law, and the issue came up repeatedly, that if a finger is pointed at another cause, there must be testimony that the cause is negligent, and that is not correct. There was no 213 disclosure that they wanted to use this. I disagree, Your Honor. There was, Clare Oaks adopted, Dr. Begall adopted, frankly, every disclosure under 213, F3. And so, therefore, was within its rights, with respect to disclosure, to refer to this testimony, or to actually to refer to the letter, at least, and to refer to Dr. Popp's involvement as a cardiology counsel. And Dr. Begall's counsel, frankly, understandably, fought tooth and nail to get the testimony to the court. And he fought tooth and nail to keep Clare Oaks from using this letter on cross-examination. You know, again, the theory against Clare Oaks being that its nurses did not adequately question the doctor about the order, or chart the order in all of the places that it should have been, and in that way, prevented the doctor from finding this error. And the letter clearly undermined that theory, and it was part of the medical record, and Clare Oaks' trial counsel should have been able to use it. It was discussed several times. Primarily, defense counsel attempted to use the letter to make the point that others saw and raised questions about the Coumadin order, which call into question the testimony of the physicians who overlooked that aspect of the medical record. And, you know, this came up several times. Judge Lyons, on several occasions, sustained the objection of either the plaintiff or Dr. Begall's attorney, and it was very clear to the court, and the court even said as much, that it knew what the questions were. And so, to the extent that plaintiffs now are saying that there was not a proper proof, again, I would say the record does not bear that out. And I'll be brief as to those, and would be happy to answer any questions the court may have. I'm content with what you've addressed. Okay. Well, thank you, Your Honor. And I would say that this is a case where, in looking, as the court must, at the testimony and the errors, not in isolation, but as a whole in the context of the record, I think it becomes clear that these errors were not intentional, and prevented a fair trial, and may have caused the jury to reach the verdict that it did, and for those reasons, we respectfully ask the court to vacate the judgment and order a new trial. Thank you. Good morning, Your Honors. As I said, my name is Michael Rasek. I'm here on behalf of the plaintiff's faculty. Moving first to the fee question, before I address some of the comments made, I'd like to point out that when the fee hearing began, the only real objection that was raised by defense counsel with the method by which the defense counsel was seeking to enforce the fee-shifting provision of the Nursing Home Care Act was the defendant attorney's belief that plaintiff was looking for more than a contract fee. If the court recalls, the dialogue went back and forth, and it came up several times. For some reason, Clara Oaks thought that the plaintiff wanted not only a contract fee, but an amount above that fee, and that clearly was not the case. Judge Lyons knew that was not the case. That was really the only objection they had. The rest of the objections and arguments kind of followed later on. The argument of Clara Oaks is that the trial court erred because it relied solely upon the contract, but that's not true. What the court meant when it was talking about that was the court meant, the trial court meant, I'm going to look at the fee request based upon the contingency fee contract rather than the Lodestar method, and defense counsel agreed that that was proper, that even if the fee request was based upon the contingency fee contract, even Mr. Chapman, who was Clara Oaks' expert, said, yes, Your Honor, if you are, in fact, looking to use the contingency fee contract as the basis for the fee, you do not have to look at the hours spent, because that's the Lodestar method, and you're not going down that path. The judge did not just rely upon the contract. The judge had Mr. Levin's description of the case. The judge had all the affidavits of the attorneys involved. The judge had the stipulation that Levin and Percanti has great expertise in this area. The judge had the testimony of Mr. Chapman, the defense expert, that this was a fantastic result, a great result. Everybody seemed to agree with that, and the judge more particularly, specifically said, not only am I familiar with this case because I'm the trial judge, but before I was on the bench, I tried cases like this. I know what goes into a case like this, and I can take my experience and apply it to what I see before us, and that's what a number of the courts have said. The U.S. Supreme Court in the Hinsley case said, the outcome is the most important thing, and other cases have said what the trial judge knows in terms of his experience becomes very important, becomes critical. As a matter of fact, I think it's the Young case that says, we don't have to have a trial judge and do it yourself. This judge gave them a hearing, and he didn't cut them off. There's no indication that anybody stood before this judge and said, judge, I need some more things to do. I need some more time. The judge was more than patient with them. They complained that their discovery was not allowed, but no one has told this court, or at least not told me, what they were looking for in terms of discovery that they couldn't have gotten out by talking to the witnesses or calling the other lawyers. In fact, the discovery, and I think I described it in our brief, the only discovery involved were interrogatories, and the interrogatories really wanted to know about the timekeeping system, and that was described during the course of this hearing. So whatever they were looking for in terms of discovery, they got already anyway. In terms of the fairness of the contract, I'm not sure that was part of the argument this morning, but it's in their brief. The clerks at this point insist that even though it's a contingency-based contract, a contingency-based fee, that the court should, in fact, look to the hours for reasonableness, and that brings me into a separate point that's related to that. First of all, a court, of course, always looks for a reasonable fee. We don't disagree with that. The answer to that here is the trial court judge on two occasions specifically said, I find this to be a reasonable fee. I understand that my job is to make sure the fee is reasonable. He said at another point, I will not, in fact, provide a windfall fee to anybody. And the other prong of that argument is that when you look to the reasonableness of the fee, the Keller case on which Claire Oakes relied specifically noted that when the trial court is looking to a contingency fee contract, what the court does is looks to the fairness of that contract. And in this case, Mr. Chapman said the fee contract is fair. I think it was the Keller court that said if the fee contract said something like the 80% fee, well, the court would have looked at it. This contract was a one-third, very standard, very normal contract that the Claire Oakes trial court agreed is pretty standard in the area. If I can shift to the cost point, the court, obviously, has a fairly simple argument that when they passed this statute, they put fees and costs. If costs in this statute were to be the same as costs in the cost statute, there was no reason to put that in. Their response is, well, there are other fee-shifting statutes where costs have been allowed. And in those cases, the costs were limited to what were the more typical costs. The answer is twofold. One, apparently the lawyers in those cases didn't know what the costs were. They didn't raise the arguments we have here. And secondly, as far as I'm aware, this is the only fee-shifting case that comes with such a history in the judicial cases about why there's a fee-shifting statute. It's to level the playing field because the people involved in these nursing homes are not, I'm trying to think of a delicate way to say, they're just not good cases. They're not good clients. The person that comes through your door is usually elderly. Frankly, their life expectancies are not good. They almost always come with comorbidities. The cases are incredibly complex, as you saw here, as Mr. Levin testified. You need experts on nursing home, on nurses, and on doctors. It results in a multitude of experts. It results in high fees. I'm sorry, in high costs. The costs in these nursing home cases, I think, are probably more significant percentage-wise to the verdicts than in any other case. Logically, if you don't allow costs to be recovered in the full sense of all the costs, it's going to make it very difficult for counsel to take these cases. And the legislature said, we want to encourage counsel to take these cases. I think it was the Frederick's court that said, when you're looking at fee-shifting statutes, you're looking at a different meaning for costs. And that's what we asked the court to do here. And switching to the criticisms of what happened at trial, they accused plaintiff of not being able to pay the plaintiff. I guess a bad tactic in its criticism of what happened. The briefs set forth all of the evidence about what went wrong. And what I can add to that is that nobody stood up for the other side in this case. Nobody stood up for Claire Oakes and said, it was okay not to challenge an order from a doctor that everyone said, including Nurse Martinez, and that result in the one place where the doctor will look. Nobody said, it's okay not to train your nurses. No one contested any of that evidence. At the end of the case, almost all the evidence went unrebutted. Regardless of the words used to criticize the conduct of the employee, specifically Nurse Martinez, the case was always going to come out the same way. Interestingly, when it came, when it comes to, I don't want to use the word pejorative, but the critical names, the critical words applied to some of the conduct, there's no objection to any of that. Trial counsel understood that his witness was in fact clueless, just as the trial court judge said. As to Nurse Pignatello, her expertise was remarkable. She runs nursing homes. She takes care of everything in these homes. She has wide experience, and she said, these are the things that I expect the nurse to do. She really never did say what she expected a doctor to do, what the doctor expected of the nurse. The testimony about what Dr. Beagle expected from the nurse came from Dr. Beagle himself and from his testimony. In fact, even Nurse Martinez said, yes, I understood. I should have put this information in the foreign order section so the doctor would see I did not do that. The bottom line is that everything that Pignatello testified about that was wrong is something that at least one other witness testified about, and I have not seen anybody show otherwise in the course of the briefing. In terms of Dr. Papp's letter, it's not correct to say that the trial court would not let defendant use the letter. There were all kinds of arguments about this, and he said, you can use the letter. As long as a witness on the stand relied upon it or even looked at it, you're going to be able to bring that up. You just cannot do one thing with that letter. You can't use that letter to suggest that Dr. Papp should have done something by himself at that point, and that was for multiple reasons. One, no one was going to provide that testimony. The only person that the witness was going to provide was the defense counsel. He admitted that. The judge said, do you have anybody to testify that something else should have been done? Not that somebody was negligent. Do you have anybody to testify that someone is going to say that Dr. Papp should have done something at that point that would affect him? He said, nobody other than me thinks Dr. Papp had any role. He was very honest. Other than that, I think I've covered all the points that were raised this morning. Unless the court has questions of me, I understand it's been a long morning already for the court. I appreciate that. We simply ask that the verdict be affirmed. Thank you. And I'll attempt to be brief as well with respect to some of the points that counsel had raised. The first issue of the hearing that Mr. Ratzak brought up was the issue of a potential double recovery. Under the attorney-client fee agreement that we're talking about here, which was Exhibit C to plaintiff's fee petition, it says that Levin and Percanti is entitled to recover one-third of the gross amount of the judgment, including fees recovered under the Nursing Home Care Act. And so it was our concern that that language could be interpreted to allow Levin and Percanti to get basically double fees here, the $1.3 million that they were entitled to under their fee agreement and the additional $1.3 million that the trial court awarded. We'd asked Judge Lyons, we'd asked Mr. Levin about that on the, on cross-examination, when we called him as a witness, and Judge Lyons refused to allow him to answer and said that he would make sure that there was no double recovery. But that's certainly, we believe, a legitimate inquiry for a party who's being asked to spend an award of attorney's fees. Respectfully, Mr. Rathsack has mischaracterized the testimony of our expert witness, James Chapman. Mr. Chapman had said that he, that this case shared enough characteristics with a regular personal injury case in terms of the liability circumstances and the damages to make it very attractive for any plaintiff personal injury lawyer. I think Mr. Levin had conceded during his testimony that this was, that this was a strong case, and that this was a strong case for them. And had this, had this accident happened at a hospital or at a rehabilitation facility, plaintiffs would not be entitled to any attorney's fees at all, because the Nursing Home Care Act obviously would not apply. It was Mr. Chapman's opinion that if any additional fees beyond the 1-3rd contingency fee that plaintiffs were already going to pay Levin and Percanti were to be awarded, he would only award nominal damages here. And Mr. Chapman also emphasized that he handles and handles a number of civil rights cases in the federal court system, and that he always emphasizes with his, the people who report to him, the importance of keeping contemporaneous time records, irrespective of whether there's a contingency fee agreement or not. And under the Lodestar method, plaintiffs' counsel is only entitled to recover reasonable fees. Keep bringing up Lodestar. It's not relevant. Okay. I respectfully disagree. Sorry, but it's just not relevant. Okay. All right. Well, lastly, I do want to address the costs argument. Again, the definition, the term costs is the same in the Nursing Home Care Act as it is in Section 1-08 of the Code of Civil Procedure. The Nursing Home Care Act was last amended back in 1996. At that point, costs had a well, was well defined under Illinois law going all the way back to the mid-1990s. And so if the legislature had intended costs to mean something more, as plaintiffs claim here, they certainly had every opportunity to correct the language in the statute. Thank you for your time. And again, we request that the jury verdict be reversed, or in the alternative, if your honors are not willing to do that, that the case be remanded for limited discovery and a new evidentiary hearing on the attorney's fees and costs. Thank you. As to Dr. Popp, counsel raised the two issues that were raised again and again by the court and accepted by the court that were not a reason to bar that cross-examination. The fact that experts don't rely on an aspect of the medical records, if they've been given it and reviewed it, it's absolutely fair game for cross-examination. That's one point. And the business about the secondary reason for raising that was, could this possibly be a sole proximate cause situation? Nobody had to say that that was a cause. It's a very slight standard, as we know from Leonardi, McPartland, and that entire line of case law. So again, I'm hearing today in court the same things that were respectfully wrong with Judge Lyon's reasoning. As for this case was always going to come out the same way, I have to disagree with that. There was a defense. There was a rebuttal. Proximate cause is a huge question mark on this record, I respectfully submit. And there was plenty of testimony to support the defense that it was Dr. Beigel's job to handle the issues of the medication. So for those reasons, I thank the court for its time and for listening to us. And as my co-counsel said, request the relief we've set forth in our briefs. Thanks very much. Thank you both. It's quite interesting how I'm glad you didn't go through all the details of the briefs, or we would have been here for three or four hours. But what you did gave us a total different perspective on the case. So I appreciate that, as well as our fellow justices. Thank you both very much.